**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BLUEFIELD DIVISION**

**HOWARD HENRY FINKEL,**

      **Plaintiff,**

**v.**                           **Case No.: 1:14-cv-03886**

**CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,**

      **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable David A. Faber, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 11, 12).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's motion for judgment on the pleadings be **DENIED;** that the Commissioner's motion for judgment

1

on the pleadings be **GRANTED;** that the decision of the Commissioner be **AFFIRMED;** and that this case be **DISMISSED**, **with prejudice,** and removed from the docket of the Court.

## I.    Procedural History

On November 15, 2010, Plaintiff, Howard Henry Finkel ("Claimant"), filed an application for DIB, alleging a disability onset date of June 15, 2010, due to "transverse myelitis; depression." (Tr. at 137, 198). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 61, 71). Claimant filed a request for an administrative hearing, (Tr. at 75), which was held on August 30, 2012, before the Honorable Jeffrey J. Schueler, Administrative Law Judge ("ALJ"). (Tr. at 28-58). By written decision dated September 13, 2012, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 11-23). The ALJ's decision became the final decision of the Commissioner on November 20, 2013, when the Appeals Council denied Claimant's request for review. (Tr. 1-3).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings, (ECF Nos. 7, 8), and both parties filed memoranda in support of judgment on the pleadings. (ECF Nos. 11, 12). Consequently, the matter is fully briefed and ready for resolution.

## II.    Claimant's Background

Claimant was 51 years old at the time he filed the instant application for benefits, and 53 years old on the date of the ALJ's decision. (Tr. at 139). He has a Master's Degree in Religion and communicates in English. (Tr. at 22, 37). Claimant has past relevant work as a pastor. (Tr. at 22).

### III.   Summary of ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a

*prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at every level in the administrative review," including the review performed by the ALJ. 20 C.F.R. § 404.1520a. First, the ALJ evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 404.1520a(b). If such impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 404.1520a(d)(1). Fourth, if the claimant's impairment is

deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 404.1520a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual function. *Id.* § 404.1520a(d)(3).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2014. (Tr. at 13, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since June 15, 2010. (*Id.,* Finding No. 2). Although Claimant had worked at a variety of jobs after that date, he had not earned sufficient wages or stayed at any of the jobs long enough for the ALJ to conclusively find that Claimant's work-related activities were "substantial" and "gainful." At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "cervical disc disease; transverse myelitis at the cervical level; depression; a bipolar disorder; and histrionic and hypomanic personality features." (Tr. at 15, Finding No. 3).

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 15-20 Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) as follows: lift and carry 10 pounds frequently and 20 pounds occasionally; push/pull or operation of foot controls occasionally; sit, stand/walk for six hours of an eight-hour workday. In addition, the claimant can never climb ladders, ropes or scaffolds, and can only

occasionally balance, stoop, kneel, crouch, crawl, or climb ramps or stairs. He can frequently handle and finger objects, and should avoid concentrated exposure to temperature extremes, vibration, moving or hazardous machinery and unprotected heights. The claimant's moderate difficulty maintaining social functioning further limits him to low-stress work, defined as having only occasional decision making or changes in the work setting, and with only occasional interaction with coworkers. The claimant's moderate difficulty maintaining concentration and persistence will cause the claimant to be off task five percent of every eight-hour workday, and thus limits him to simple, routine, unskilled tasks.

(Tr. at 20-22, Finding No. 5). At the fourth step, the ALJ found that Claimant was unable to perform his past relevant work. (Tr. at 22, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in substantial gainful activity. (22-23, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1959 and was defined as an individual closely approaching advanced age; (2) he had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the disability determination. (Tr. at 22-23, Finding Nos. 7-9). Given these factors, Claimant's RFC, and with the assistance of a vocational expert, the ALJ concluded that Claimant could perform jobs that exist in significant numbers in the national economy. (Tr. at 22-23 Finding No. 10). At the unskilled occupations, Claimant could work as a janitor/housekeeper cleaner; packer-laundry folder; or assembler. (Tr. at 23). Therefore, the ALJ found that Claimant was not disabled as defined in the Social Security Act, and was not entitled to benefits. (Tr. at 23, Finding No. 11).

## IV.  <u>Claimant's Challenge to the Commissioner's Decision</u>

Claimant argues that the decision of the Commissioner's is not supported by substantial evidence for three reasons. First, the ALJ failed to conduct a proper

credibility assessment. According to Claimant, rather than evaluating his allegations of pain against the evidence, the ALJ simply dismissed the allegations "to the extent they were inconsistent with" the RFC findings, without further analysis or explanation. (ECF No. 11 at 5-6). Second, the ALJ improperly weighed the medical source opinions, failing to give controlling weight to the opinions of Claimant's treating neurologist, Dr. J. Gordon Burch. (*Id.* at 7-13). Claimant emphasizes that Dr. Burch, who treated him since 2002, unequivocally opined that Claimant was unable to sustain any kind of gainful employment. Yet, the ALJ discredited that opinion and instead gave greater weight to the opinions of a one-time agency examiner, Dr. Craft, in violation of Social Security regulations and rulings. Lastly, Claimant contends that the ALJ erred at step five of the sequential process when he rejected testimony by the vocational expert that no jobs were available to a hypothetical claimant whose RFC fairly reflected the functional limitations suffered by Claimant. Instead, the ALJ found Claimant capable of performing jobs offered by the vocational expert in response to a hypothetical question that did not fully and accurately account for the severity of Claimant's functional limitations. (*Id.* at 13-14).

In response, the Commissioner maintains that the ALJ fully complied with applicable regulations and rulings in evaluating Claimant's credibility and in weighing the medical source opinions. (ECF No. 12 at 7-16). The Commissioner points out that Dr. Burch's opinions regarding Claimant's inability to engage in work-related activities are not entitled to special weight because they are opinions on an issue reserved to the Commissioner. The Commissioner further notes that the ALJ acted well within his authority to reject opinions by Dr. Burch that were inconsistent with other substantial evidence in the record. In the Commissioner's view, the ALJ acted appropriately in

giving more weight to the RFC assessments of agency experts, Dr. Lim and Dr. Gomez, than to the opinions of Dr. Burch because Dr. Burch's opinions were not well-substantiated while the statements of Dr. Lim and Dr. Gomez were based on objective medical findings and Claimant's self-reported daily activities. (ECF No. 12 at 7-15). Finally, the Commissioner contends that the second hypothetical question presented to the vocational expert correctly reflected Claimant's RFC findings, and the ALJ relied upon the vocational expert's testimony in response to that hypothetical scenario. Accordingly, the ALJ properly concluded that jobs existed in significant numbers in the regional and national economy that Claimant was capable of performing. (ECF No. 12 at 16).

## V.  **Relevant Medical History**

While the undersigned has reviewed all evidence of record, only the medical information most relevant to the disputed issues is summarized below:

### A. *Treatment Records*

On July 20, 2009, Claimant had a follow-up appointment with his treating neurologist, J. Gordon Burch, M.D. (Tr. at 325). Claimant's primary diagnosis was "[t]ransverse myelitis[1] at the cervical level with secondary extremity and posterior neck pain, disabling in severity but much improved on current therapy," and his secondary diagnosis was noted to be intermittent depression for which he was "under the care of Dr. Hasan of psychiatry." (*Id.*). Dr. Burch indicated that Claimant was generally doing very well, although he continued to complain of pain and soreness across the shoulders

---

[1] Transverse myelitis is a neurological disorder caused by inflammation across both sides of one level, or segment, of the spinal cord. The term *myelitis* refers to inflammation of the spinal cord; *transverse* simply describes the position of the inflammation, that is, across the width of the spinal cord. "Transverse Myelitis Fact Sheet," NIH Publication No. 12-4841, National Institute of Neurological Disorders and Stroke, National Institutes of Health.

into the arms and hands. An examination revealed mild to moderate weakness of the intrinsic muscles of the right hand with evidence of early atrophic change. The left hand displayed mild weakness; however, there was no evidence of atrophic change. (*Id.*). The remainder of the examination was unremarkable, except Claimant's reflexes were hypoactive. Dr. Burch arranged for an MRI of the cervical and thoracic spine and continued Claimant on methadone 10 mg and Vicoprofen for pain, as Claimant reported effective pain control with this medication combination. (*Id.*).

That same day, Claimant reported to the Center for Advanced Imaging to undergo an MRI of the thoracic and cervical spine. (Tr. at 333, 334). The thoracic spine images showed normal vertebral alignment and, overall, were unremarkable. (Tr. at 333). The cervical spine images appeared to be largely unchanged from prior films with no definite new lesion noted. Spondylotic and disc changes were seen, with disc disease found at C4-5, C5-6, C6-7. The disc bulge at C6-7 was the largest and was predominately central, with some left-sided foraminal narrowing. An abnormal signal in the posterior aspect at the level of C1-2 was noted, but had not changed from prior imaging.  Overall, the findings were stable.(Tr. at 334).

Dr. Burch examined Claimant on September 14, 2009, documenting that Claimant was "generally doing very well and is satisfied with the impact of medication." He was exercising regularly, but had considerable spinal axis and extremity pain. Claimant also reported a marked sensitivity to touch and stimulus in the hands and upper neck, and Dr. Burch felt his course of treatment was complicated by Claimant's depression. (Tr. at 326). Claimant's primary diagnosis was myelopathy believed to be demyelinating but without evidence of a more generalized disease process. Other physical complaints included a tendon tear in the right hand for which Claimant was

being seen by orthopedist, Dr. Fred Morgan. Dr. Burch examined Claimant and found hyperesthesia of the hands bilaterally; otherwise, the neurological findings were as previously documented. His medications were continued with a reduction in the dosage of methadone to 5 mg.

Claimant returned to Dr. Burch on November 2, 2009. (Tr. at 327). He reported his condition as being stable since his last examination, although there was one instance two or three weeks earlier when Claimant had a two-day interval of increased upper extremity pain similar to that seen with restless leg syndrome, which made sleep difficult. (*Id.*). However, Claimant had been dieting and exercising since then and was "really doing quite well" and "generally [was] enjoying a sense of wellbeing now." (*Id.*). He was tolerating the reduction in methadone with no increased need for the hydrocodone rescue therapy. Claimant's neurological examination was unchanged and unremarkable, and his treatment plan likewise remained unchanged with an instruction to follow-up in three months. (*Id.*).

As advised, Claimant returned to Dr. Burch's office on February 12, 2010. Dr. Burch noted that Claimant was "doing well" and was "enjoying a sense of wellbeing." (Tr. at 328). Claimant continued to tolerate his medications without problems and reported satisfactory pain control using on average one Vicoprofen or less per day. (*Id.*). His neurological examination was unchanged; unremarkable, with a review of systems notable only for pain syndrome with neck pain. The "restless arm syndrome" from three months prior had resolved. (*Id.*). He was instructed to continue with his current medications.

On August 9, 2010, Claimant presented to Dr. Burch's office for an unscheduled visit related to an emotional problem he was experiencing. (Tr. at 329). Dr. Burch

documented that Claimant was stable from a neurological perspective, so Dr. Burch offered support and encouragement to help with the emotional crisis.

On December 20, 2010, Claimant returned to Dr. Burch's officer early, reporting he had not taken methadone for the past few days and was using Hydrocodone in its place. (Tr. at 330). Claimant advised that twenty methadone tablets had been stolen from his desk drawer. As Claimant had demonstrated a history of medication compliance, Dr. Burch accepted this explanation. (*Id.*). Claimant had no new complaints, stating that he was doing reasonably well with adequate pain control. (*Id.*).

Claimant presented to Dr. Burch's office on February 8, 2011 and advised that he was experiencing sleep disruption due to increased pain stemming from transverse myelitis. (Tr. at 331). Claimant also admitted that he was under great personal stress related to a divorce and, for a time, his financial situation was so precarious, he could not afford Wellbutrin and Lamictal, which had been very helpful in treating his depression. However, he had recently started back on those medications. (*Id.*). Claimant's neurological examination remained unchanged. Still, due to his complaint of feeling more pain, Dr. Burch increased Claimant's methadone dosage to 10 mg with Vicoprofen for rescue therapy. (*Id.*).

On June 14, 2011, Claimant returned to Dr. Burch's office for follow-up. (Tr. at 332). Dr. Burch noted that Claimant had experienced an exacerbation of his primary disease process at the end of April, which began with numbness of the left foot spreading to the right foot, leg, and lower abdomen from the waist distally. He was treated with steroid therapy that was effective, but did not return him to baseline. He complained of increased pain and weakness in both hands, stating that he found it difficult to do repetitive motor functions and negotiate steps. (*Id.*). Claimant's

neurological examination revealed mild weakness proximally in the upper limbs with greater weakness in the grip bilaterally, right worse than left, in addition to some compromise of motor dexterity to both hands. (*Id.*). Although he had normal to near normal strength in the lower extremities, there were signs of weakness distally at the ankle and dorsiflexors. Deep tendon reflexes were hard to produce as Claimant had significant startle response. (*Id.*). Dr. Burch noted that Claimant had difficulty multitasking, showing mild cognitive disorganization. His diagnosis remained transverse myelitis with major extremity pain syndrome requiring aggressive pain management. (*Id.*). Dr. Burch decided to continue with the same medication regimen and consider intravenous Solu-Medrol if Claimant's symptoms worsened or recurred in the future. (*Id.*).

Dr. Burch examined Claimant on May 16, 2012 for a diagnosis of transverse myelitis; almost certainly demyelinating and presenting as a clinically isolated syndrome with no evidence of multiple sclerosis. (Tr. at 363). Claimant appeared more symptomatic than he had in the prior years, recently reporting abnormal sensations of tingling or buzzing of the hands, arms, and throughout the lower limbs. In addition, Claimant reported an increase in fatigue and a decreased ability to tolerate exercise and withstand stress. He also noted some postural dizziness. (*Id.*). Claimant's neurological examination revealed normal cranial nerve function with clear and fluent speech. The motor examination showed a mild generalized weakness appearing greater in the lower limbs distally at the ankle dorsiflexor. His reflexes were trace 1+ in the extremities with exhibition of a slow and deliberate gait. The remainder of the examination was unremarkable. (*Id.*). Dr. Burch kept the treatment plan remained in place, but noted that Claimant had a very limited exercise tolerance as well as an inhibited capacity to

sustain gainful employment. He added that even working as a substitute teacher with very limited hours and infrequent work assignments, Claimant reported that he was easily exhausted. (*Id.*).

### B. Evaluations and Opinions

Tonya McFadden, Ph.D, performed an Adult Mental Profile on February 1, 2011 as reported to the SSA on February 22, 2011. (Tr. at 283-288). Claimant presented with a diagnosis of transverse myelitis and complaints of "mood symptoms." (Tr. at 284). His initial depressive episode began in 2003, although he currently felt "discouraged" due to his marital status. He also reported that he had received a prior diagnosis of bipolar disorder with hypomanic symptoms. He detailed a lack of interest, decreased appetite, and rarely feeling energetic unless experiencing a hypomanic episode, in addition to having feelings of worthlessness. (*Id.*). Upon examination, Claimant was cooperative with relevant speech delivered in a normal rhythm and tone. (Tr. at 286). His mood appeared depressed with restricted affect although his behavior appeared within normal limits. Claimant's thought process, thought content, judgment, immediate and remote memory, concentration, and pace were within normal limits, and his persistence was fair. (Tr. at 287). Claimant described his daily activities as helping his children get ready for school; driving to work with a work schedule of six to nine hours; attending church; and completing independent personal hygiene.

Dr. McFadden diagnosed bipolar disorder, NOS, currently depressed mood; history of polysubstance abuse reported in long term sustained remission; and partner related problem along Axis I. The Axis II diagnosis was histrionic and hypomanic personality features, per record. Dr. McFadden supported her diagnosis of bipolar disorder due to Claimant's report of depressed mood as well as a history of hypomanic

13

symptoms documented in prior psychiatric records. Dr. McFadden noted that Claimant remained in a depressed mood with restricted affect during the evaluation. (*Id.*). She felt Claimant's prognosis to be guarded. (Tr. at 288).

Philip E. Comer, Ph.D., completed a Psychiatric Review Technique report on February 28, 2011, noting an RFC assessment would be necessary. (Tr. at 293-306). He found Claimant to be mildly limited in his activities of daily living and in maintaining social function. (Tr. at 303). Claimant was moderately limited in his ability to maintain concentration, persistence, and pace, with one or two episodes of decompensation. (*Id.*). Dr. Comer felt the evidence did not establish the presence of the paragraph "C" criteria. (Tr. at 304).

By report of same date, Dr. Comer completed a Mental Residual Functional Capacity Assessment. (Tr. at 289-292). Dr. Comer found Claimant not significantly limited in any category of understanding and memory. (Tr. at 289). As to sustained concentration and persistence, Claimant was not significantly limited in his ability to carry out very short, simple instruction or detailed instructions; sustain an ordinary routine without special supervision; work in coordination with or proximately to others without being distracted by them; make simple work related decisions; and complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistence pace without unreasonable number and length of rest periods. (Tr. at 289-290). However, Claimant was moderately limited in his ability to maintain attention and concentration for extended periods as well as perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. (Tr. at 289). With regard to social interaction, Dr. Comer found Claimant not to be significantly limited in his ability to interact appropriately with

14

the general public; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (Tr. at 290). Nonetheless, Claimant was moderately limited in his ability to get along with co-workers or peers without distracting them or exhibiting behavior extremes. (*Id.*). As to adaptation, Claimant was not significantly limited in his ability to be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others. However, he was found moderately limited in his ability to respond appropriately to changes in the work setting. (*Id.*). In summary, Dr. Comer found Claimant retained the residual mental and emotional capacity to perform work activity in an environment that could accommodate some mood lability as well as his physical limitations. (Tr. 291).

On February 28, 2011, Gary Craft, M.D., performed a physical examination and disability evaluation of Claimant at the request of the SSA. (Tr. at 308-313). Claimant provided a medical history of transverse myelitis involving the cervical spine for the past nine years. He complained of marked weakness of the posterior neck, both shoulders, arms, hands, and upper back, with numbness over each hand. (Tr. at 308). Claimant's medication regimen included a prescribed daily dose of methadone in addition to Vicopren as needed for pain. His psychiatric treatment for anxiety depressive disorder included prescriptions for Wellbutrin and Lamictal. (*Id.*).

On physical examination, Claimant was alert, cooperative, well-oriented, fully ambulatory, and in no acute distress. (Tr. at 309). An examination of Claimant's neck revealed full range of motion with tenderness over the posterior neck on palpation. Both shoulder and elbow joints showed a full range of motion. The right hand displayed

minimal early interosseous muscle atrophy with grip strength in both hands at 5/5. Motor power over each arm rated 4/5. Claimant was able to grasp and open a doorknob with each hand without major difficulty, and could pick up a paperclip, coin, and pen. (*Id.*). An examination of Claimant's back showed no deformities or muscle spasms, although forward bending was measured at seventy degrees with Claimant demonstrating a fair ability to squat. (Tr. at 310). Claimant's station and gait were normal, as were toe and heel walking. His lower extremities had a full range of motion and were free of deformity, redness, or swelling. Straight leg raising tests were negative bilaterally. Claimant's deep tendon reflexes were 4+ and symmetrical, although he was hypersensitive to pinprick over each lower extremity. His ankles were normal, free of swelling and the pulses were strong. (*Id.*).

Dr. Craft summarized Claimant's nine-year history of transverse myelitis of the cervical spine, stating that Claimant had progressive severe weakness and numbness of the neck, arms, hands, and upper back, with decreased motor power of each arm and decreased hand grip strength. Claimant also had early wasting of the small muscles of the right hand with hyperreflexia over each upper extremity and hypersensitivity to pinprick. However, Claimant's fine manipulation remained intact. (*Id.*). Dr. Craft noted that Claimant had minimal loss of forward bending, and could walk without assistance. Dr. Craft added that Claimant was receiving treatment for anxiety depressive disorder and throughout the examination, he exhibited moderate anxiety with a very flat affect. Based upon his examination, Dr. Craft opined the long term prognosis for improvement of the condition of transverse myelitis was "completely nil," while the long term prognosis for Claimant's mental condition was "poor." (*Id.*).

On March 9, 2011, Dr. Rogelio Lim completed a Residual Functional Capacity Assessment at the request of the SSA. (Tr. at 314-21). He opined that Claimant could occasionally lift and carry twenty pounds and could frequently lift and carry ten pounds. He could stand and/or walk about six hours in an eight-hour workday, and could sit about six hours, as well. Dr. Lim felt Claimant had unlimited ability to push or pull, including the ability to operate hand or foot controls. (Tr. at 315). As far as postural limitations, Dr. Lim thought Claimant should never climb ladders, ropes, or scaffolds, and should only occasionally climb stairs and ramps, balance, stoop, kneel, crouch, or crawl. (Tr. at 316). He opined that Claimant had no manipulative, visual, or communicative limitations. (Tr. at 317-18). However, Dr. Lim recommended that Claimant avoid concentrated exposure to extreme heat and cold, vibrations, and hazards like machinery and heights. (Tr. at 318). Dr. Lim found Claimant to be only partially credible in his allegations of pain and disability given his mild neurological findings and ability to walk without assistance and grip. According to Dr. Lim, Claimant was capable of at least light exertional work with postural limitations. (Tr. at 321). On July 11, 2011, after reviewing all of the evidence contained in Claimant's disability file, A. Rafael Gomez, M.D., prepared a Case Analysis affirming Dr. Lim's Physical Residual Functional Capacity Assessment as written. (Tr. at 362).

On June 14, 2011, Dr. Burch completed a Routine Abstract Form-Physical for the West Virginia Disability Determination Section. (Tr. at 337-41). He indicated that Claimant had a history of transverse myelitis with secondary spinal axis pain, requiring pain medication. Claimant had recently had a relapse with weakness of hands and increased pain. According to Dr. Burch, Claimant's gait and station were normal, and his fine motor ability was normal, except for decreased strength and dexterity in his hands.

17

Nevertheless, Claimant was noted to be capable of making a fist, picking up coins, buttoning clothing, and tying a shoestring.  (Tr. at 338).  His gross motor ability was normal, except for weakness at the wrists and hand grip, but he had no joint swelling, tenderness, or effusion, and his muscle bulk was normal in all extremities. (*Id.*). Claimant had no problems with coordination, and no identified sensory deficits. (Tr. at 339). Without further explanation, Dr. Burch stated that Claimant could only stand and walk for short intervals; was unable to lift, carry, or handle objects effectively; and was permanently disabled from all work due to his neurological disease. (Tr. at 341).

J. Hill Keyes, Ph.D., completed a Psychiatric Review Technique on July 6, 2011, noting an RFC assessment was necessary. (Tr. at 348-60). Dr. Keyes found that Claimant had an affective disorder in the form of bipolar syndrome, in addition to a histrionic personality, as well as a history of polysubstance abuse, currently in long term sustained remission. (Tr. at 351, 355, 356). As to functional limitations, Dr. Keyes found Claimant   possessed a mild degree of functional limitation with restrictions of activities of daily living and difficulty in maintaining social function. (Tr. at 358). Claimant had a moderate limitation with difficulty in maintaining concentration, persistence or pace with no episodes of decompensation. (*Id.*). Dr. Keyes felt the evidence did not support the presence of the paragraph "C" criteria. (Tr. at 359). She opined that Claimant's statements were partially consistent with the medical and non-medical records concluding he was partially credible. Dr. Keyes further noted Claimant was employed at the time he was alleging disability. (Tr. at 360).

By report of same date, Dr. Keyes prepared a Mental Residual Functional Capacity Assessment. (Tr. at 344-346). Dr. Keyes found Claimant was not significantly limited in his ability to remember locations and work-like procedures; understand and

remember very short and  simple instructions; as well as understand and remember detailed instructions. (Tr. at 344). As to sustained concentration and persistence, Claimant was not significantly limited in his ability to carry out very short and simple directions; carry out detailed instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; and make simple work-related decisions. (*Id.*). However, Claimant was moderately limited in his ability to maintain attention and concentration for extended periods; as well as complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. at 344-345). Claimant was not significantly limited in any category of social interaction and adaption. (Tr. at 345). Dr. Keyes noted that Claimant was diagnosed with bipolar disorder with symptoms that were generally stable, which allowed for good vocational aptitude. Dr. Keyes opined Claimant did have a history of occasional episodes of hypomania which would result in brief disruptions to functioning; however, Claimant had demonstrated the ability to sustain long periods of employment with brief rest periods. Additionally, the prescribed psychotropic medications were effective in regulating his symptoms and the resultant disruptions. (Tr. at 346).

On August 7, 2012, Dr. Burch prepared a letter documenting his treatment of Claimant for a diagnosis of transverse myelitis. (Tr. at 365). Dr. Burch wrote that the condition primarily manifested as pain in the extremities, and the upper extremity pain made it difficult for Claimant to use a pen or pencil comfortably. (*Id.*). Additionally, the myelitis had recently produced extremity and truncal sensory symptoms, most

19

noticeable when Claimant was in a seated or in a recumbent position for any extended length of time. According to Dr. Burch, this led to problems in Claimant's effective use of his upper and lower limbs manifesting as sensory ataxia or instability of the gait. Dr. Burch opined that Claimant's neurological disorder rendered him totally and permanently disabled, stating "[h]e is unable to sustain over an 8-hour, 5-day week regular gainful employment." (*Id.*).

Dr. Burch also prepared a letter to Claimant's counsel on October 12, 2012, outlining the history and treatment of Claimant's neurological condition. (Tr. at 366-367). Dr. Burch documented his first examination of Claimant on May 31, 2002, during which he diagnosed transverse myelitis at the cervical level, which was confirmed by MRI of the cervicothoracic cord. MRI results revealed at least three inflammatory lesions in the cord. This condition caused Claimant severe cervicothoracic spinal axis pain; intermittent and disabling muscle spasm of the paraspinous musculature; and pain and numbness that extended into the upper extremities. (Tr. at 366). Since the diagnosis, Dr. Burch had seen Claimant 77 times. Dr. Burch explained that a primary concern with transverse myelitis was that it was actually part of a larger picture, which included multiple sclerosis; however, Dr. Burch had performed several evaluations that, so far, had provided no evidence of multiple sclerosis. (*Id.*). According to Dr. Burch, Claimant experienced cervical and thoracic pain and periodically suffered thoracic paraspinal muscle spasms accompanied by pain and sensory disturbance extending to the upper limbs. (Tr. at 367). His condition required major pain management intervention. Dr. Burch opined the episodes of symptomatic pain, muscle spasm, and fatigue compromised Claimant's ability to carry out both physical and cognitive activity at a significant level. Dr. Burch added that Claimant's depression also interfered with his

treatment course. Dr. Burch felt Claimant would continue to require active pain management intervention although his response to treatment would remain incomplete, and he opined that Claimant's functional limitations were permanent. (*Id.*).

## VI.   Scope of Review

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a de novo review of the evidence to ascertain whether the claimant is disabled. Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001)). Instead, the Court's role is limited to insuring that the ALJ followed applicable regulations and rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.   Discussion

Claimant's three challenges to the ALJ's decision involve the propriety of the credibility analysis, the treatment of medical source opinions, and the validity of the ALJ's step five determination. Each challenge will be addressed in turn.

### A. Credibility Analysis

Claimant argues that the ALJ's RFC assessment is unsupported by substantial evidence because the ALJ improperly evaluated Claimant's credibility. According to Claimant, the "evidence of disabling pain was overwhelming;" therefore, the ALJ erred when he disregarded Claimant's statements of debilitating pain on the basis that they were inconsistent with the ALJ's RFC finding, which is **not** evidence. (ECF No. 11 at 5-6). In Claimant's view, rather than assessing his credibility based on actual evidence in order to determine his RFC, the ALJ simply discredited Claimant's statements to the extent they conflicted with the ALJ's preconceived RFC finding.

Social Security regulations and rulings require an ALJ to evaluate the credibility of a claimant's statements concerning pain using a two-step process. 20 C.F.R. § 404.1529. First, the ALJ must determine whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's alleged pain. *Id.* § 404.1529(a). A claimant's "statement about his or her symptoms is not enough in itself to establish the existence of a physical or mental impairment or that the individual is disabled." SSR 96-7p, 1996 WL 374186, at *2. Instead, there must exist some objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" which demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 404.1529(b).

Second, after establishing that the claimant's impairments could be expected to produce the alleged pain, the ALJ must evaluate the intensity, persistence, and severity of the pain to determine the extent to which it prevents the claimant from performing

22

basic work activities. *Id.* § 404.1529(a). If the intensity, persistence or severity of the pain cannot be established by objective medical evidence, the ALJ must assess the credibility of any statements made by the claimant to support the alleged disabling effects. SSR 96-7P, 1996 WL 374186, at *2. In evaluating a claimant's credibility regarding his or her symptoms, the ALJ will consider "all of the relevant evidence," including (1) the claimant's medical history, signs and laboratory findings, and statements from the claimant, treating sources, and non-treating sources, *id.* § 404.1529(c)(1); (2) objective medical evidence, which is obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, *id.* § 404.1529(c)(2); and (3) any other evidence relevant to the claimant's symptoms, such as evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and any other factors relating to functional limitations and restrictions due to the claimant's symptoms. *Id.* § 404.1529(c)(3); *see also Craig v. Chater*, 76 F.3d 585, 595 (4th Cir. 1996); SSA 96-7P, 1996 WL 374186, at *4-5. In *Hines v. Barnhart*, the Fourth Circuit Court of Appeals stated that:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges he suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). The ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations; however, the lack of objective medical

evidence may be one factor considered by the ALJ. SSR 96-7P, 1996 WL 374186, at *6.

Social Security Ruling 96-7p provides further guidance on how to evaluate a claimant's credibility. For example, "[o]ne strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." *Id.* at *5. Likewise, a longitudinal medical record "can be extremely valuable in the adjudicator's evaluation of an individual's statements about pain or other symptoms," as "[v]ery often, this information will have been obtained by the medical source from the individual and may be compared with the individual's other statements in the case record." *Id.* at *6-7. A longitudinal medical record demonstrating the claimant's attempts to seek and follow treatment for symptoms also "lends support to an individual's allegations ... for the purposes of judging the credibility of the individual's statements." *Id.* at *7. On the other hand, "the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints." *Id.* Ultimately, the ALJ "must consider the entire case record and give specific reasons for the weight given to the individual's statements." *Id.* at *4. Thus, the reasons given for the ALJ's credibility assessment "must be grounded in the evidence and articulated in the determination or decision." SSR 96-7p, 1996 WL 374186, at *4.

When considering whether an ALJ's credibility determinations are supported by substantial evidence, the Court does not replace its own credibility assessments for those of the ALJ; rather, the Court studies the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to credibility, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Because the ALJ had the "opportunity to observe the demeanor and to

24

determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

Here, the ALJ acknowledged the two-step process and began by examining Claimant's medically determinable physical impairments of transverse myelitis and cervical disc disease and his mental impairment of depression, which together allegedly limited Claimant's ability to lift, walk, squat, bend, stand, reach, sit, kneel, handle, balance, climb, and tolerate stress and change. (Tr. at 21). The ALJ accepted that these conditions could reasonably be expected to cause the symptoms alleged by Claimant, including pain. (*Id.*). Nevertheless, the ALJ reasoned that Claimant's statements regarding the intensity, persistence, and limiting effects were not credible to the extent they were inconsistent with the RFC finding for a number of reasons. First, the ALJ pointed out that Claimant was able to walk independently despite his diagnosis of transverse myelitis and degenerative disc disease. (*Id.*). This is a significant point given that the permanent neurological sequelae generally associated with persistent, severe transverse myelitis include spastic gait, severe limb weakness, and paralysis.[2] Second, the ALJ noted that although Claimant reported sensory changes in his extremities, no objective evidence of neuropathy existed. Moreover, Dr. Burch's records indicated that Claimant had truncal sensory symptoms mainly when he sat or lied down, not when he stood or walked. In addition, Dr. Craft's examination showed normal grip strength, gait, and station; only slightly reduced strength in all extremities; and only minimal, early signs of atrophy in the hands. (*Id.*). Third, the ALJ questioned the reliability of a

---

[2] "Transverse Myelitis Fact Sheet," NIH Publication No. 12-4841, National Institute of Neurological Disorders and Stroke, National Institutes of Health.

notation by Dr. Burch indicating that Claimant could not tolerate much exercise. The ALJ pointed out that the notation was based entirely on Claimant's subjective reports and was inconsistent with objective findings. Furthermore, even though Dr. Burch documented the complaint, he never performed or requested an objective functional assessment to test its validity. Next, the ALJ felt that Claimant's lack of mental health treatment since August 2010 and his ongoing effort to find employment from October 2010 to June 2012 also undermined his allegations of disabling pain and depression. (*Id.*). Lastly, the ALJ relied on the opinions of the agency consultants, who found that Claimant retained the RFC to perform a reduced range of unskilled, light exertional work. (Tr. at 21-22). The ALJ found these opinions to be consistent with the objective medical findings, the Claimant's treatment history, and his activities of daily living.

Clearly, the ALJ did not limit his credibility analysis to a preconceived RFC finding as Claimant suggests; instead, the ALJ complied with the two-step process outlined in the regulations and rulings and then explained his conclusions with reference to specific evidence that he found persuasive. While the ALJ's use of boilerplate template language at the outset of his discussion was perhaps ill-advised, he performed an appropriate analysis and his determination is supported by substantial evidence. *See Mascio v. Colvin,* No. 2:11–CV–65–FL, 2013 WL 3321577, at *3 (E.D.N.C. July 1, 2013) (holding that the ALJ's use of the same boilerplate language "is not an error [and] does not require remand" if the ALJ has otherwise performed and explained his conclusions adequately); *Wilds v. Colvin,* No. 1:13cv318, 2015 WL 339643, at *7 (M.D.N.C. Jan. 23, 2015) (same); *Thompson v. Colvin,* No. 7:13cv00032, 2014 WL 4792956, at *14 (W.D. Va. Sept. 25, 2014) (holding that use of boilerplate language is acceptable as long as the ALJ adequately explains his credibility findings).

26

Accordingly, the undersigned **FINDS** that the ALJ performed an appropriate credibility analysis, in accordance with governing regulations and rulings.

### B. *Weighing Medical Source Opinions*

When evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. § 404.1527(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* § 404.1527(a)(2).

The regulations outline how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. *Id.* § 404.1527(c). In general, the ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source, and even greater weight to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *Id.* § 404.1527(c)(1)-(2). However, a treating physician's opinion on the nature and severity of an impairment is afforded ***controlling*** weight only if two conditions are met: (1) the opinion is well-supported by clinical and laboratory diagnostic techniques and (2) the opinion is not inconsistent with other substantial evidence. *Id.* When a treating physician's opinion is not supported by clinical findings, or is inconsistent with other substantial evidence, the ALJ may give the physician's opinion less weight. *Mastro v. Apfel,* 270 F.3d 171, 178 (4th Cir. 2001).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must analyze and weigh all the medical opinions of record, taking into account the following factors: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. 20 C.F.R. § 404.1527(c)(2)-(6). The ALJ must provide "specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record." SSR 96-2p, 1996 WL 374188, at *5 (S.S.A. 1996). "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected ... In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." *Id.* at *4. On the other hand, when there is persuasive contrary evidence in the record, a treating physician's opinion may be rejected in whole or in part. *Coffman v. Bowen,* 829 F.2d 514, 517 (4th Cir. 1987). Generally, the more consistent a physician's opinion is with the record as a whole, the greater the weight an ALJ will assign to it. *Id.* § 404.1527(c)(4). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.

Medical source statements on issues reserved to the Commissioner are treated differently than other medical source opinions. SSR 96-5p, 1996 WL 374183 (S.S.A. 1996). In both the regulations and SSR 96-5p, the SSA explains that "some issues are not medical issues regarding the nature and severity of an individual's impairment(s)

but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability;" including the following:

> 1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;

> 2. What an individual's RFC is;

> 3. Whether an individual's RFC prevents him or her from doing past relevant work;

> 4. How the vocational factors of age, education, and work experience apply; and

> 5. Whether an individual is "disabled" under the Act.

*Id.* at *2. "The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner." *Id.* As such, a medical source statement on an issue reserved to the Commissioner is never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." *Id.* at *2. These opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole, but ultimately they are not controlling. *Id.* at *3.

Here, Claimant contends that the ALJ erred by failing to give proper weight to Dr. Burch's "repeated diagnosis of severe pain" and "limited ability for gainful employment," and his repeated opinions that Claimant "was totally disabled from any substantial gainful employment." (ECF No. 11 at 7). Claimant argues that Dr. Burch's opinions are supported by medically acceptable clinical and laboratory data and are not

inconsistent with other substantial evidence in the record; therefore, they were entitled to controlling weight.

In examining the written decision, it is clear that the ALJ gave differing degrees of weight to various opinions expressed by Dr. Burch. For example, the ALJ fully accepted Dr. Burch's diagnoses of cervical disc disease and transverse myelitis, which were opinions about the nature of Claimant's impairments, and the ALJ further agreed that these medical conditions were severe impairments, meaning that they significantly limited Claimant's ability to perform basic work activities. In doing so, the ALJ noted that MRI findings showed disc changes from C4-C7 and a focal increased signal within the spinal cord at C1-C2. Thus, the ALJ pointed to objective evidence supporting the diagnoses. Moreover, the diagnoses were consistent with other evidence in the record, including Claimant's longstanding symptoms and complaints. The ALJ was aware that Dr. Burch treated Claimant with medications that controlled the pain, and Claimant's neurologic condition remained stable under Dr. Burch's care for more than a year and a half, from July 20, 2009 through February 8, 2011. (Tr. at 15-16).

In June 2011, Dr. Burch completed a Routine Abstract for disability determination purposes, and indicated that Claimant was "totally and permanently disabled." (Tr. at 337-41). The ALJ acknowledged Dr. Burch's statement, but expressed skepticism about its validity for a couple of reasons. First, the abstract was written on the same day that Claimant had reported an acute exacerbation of his symptoms. (Tr. at 18). Second, Claimant's physical findings, as recorded by Dr. Burch, were not significantly abnormal or substantially different from his customary findings. Claimant's upper limbs reflected only mild weakness proximally; he had some unspecified degree of compromise of motor dexterity in the hands; and strength in his lower limbs was

normal or near normal with some weakness of the ankles and dorsiflexors. Dr. Burch was unable to assess deep tendon reflexes because of Claimant's heightened startle response.  Claimant had normal gross motor ability. Despite relatively modest objective findings, Dr. Burch stated that Claimant was only able to stand or walk for short intervals and could not effectively lift, carry, or handle objects.

In August 2012, Dr. Burch reiterated his opinion that Claimant was permanently disabled, although he last saw Claimant on May 12, 2012. (Tr. at 18). In May, Claimant reported having increased fatigue, decreased exercise and stress tolerance, postural dizziness, and tingling in his extremities. However, Claimant was working part-time as a substitute teacher. His physical examination showed mild generalized weakness that was greatest at the ankle dorsiflexors. Still, Claimant ambulated independently. His pain was being controlled with medication, and his health was otherwise stable with no new diagnoses. Despite the absence of new or additional abnormal findings, Dr. Burch concluded that Claimant had very limited capacity to exercise or to work. The ALJ did not fully credit Dr. Burch's statement that Claimant had "very limited exercise tolerance," because the statement was based entirely on Claimant's subjective report and had not been corroborated by any objective findings, laboratory studies, or testing. The ALJ emphasized that Dr. Burch did not perform or order a functional capacity evaluation. (Tr. at 21). The ALJ also pointed out that the statement was inconsistent with objective findings made by Dr. Craft on his examination of Claimant in March 2011; such as, an absence of substantial muscle wasting; Claimant's normal grip strength, gait and station, and near normal strength in all extremities. For those same reasons, the ALJ discounted Dr. Burch's opinion that Claimant was limited in pushing, pulling, and operating foot controls. Once again, the ALJ found this opinion to have no

objective support and to be inconsistent with other substantial evidence.

The ALJ repeatedly explained that he did not give controlling weight, or even great weight, to Dr. Burch's opinions regarding the severity of Claimant's functional limitations because (1) the objective physical findings did not change much over time and did not support such severe limitations, (2) the other medical experts did not find the limitations to be so severe when examining the same objective findings, (3) Dr. Burch's treatment records, Dr. Craft's examination report, and Claimant's activities were inconsistent with the level of impairment alleged by Dr. Burch, and (4) Dr. Burch put too much credence in Claimant's subjective reports given that Claimant was not fully credible. The ALJ explicitly gave weight to the agency consultants who found that Claimant retained the capacity to perform light work with some additional limitations, because the consultants based their opinions on objective findings, the treatment history, and Claimant's activities. Accordingly, the ALJ complied with the regulations and rulings by considering the medical source opinions; determining that the treating source opinion was not consistent with or supported by the evidence and thus was not entitled to controlling weight; and then weighing all of the opinions considering the evidence as a whole. Claimant suggests that the ALJ did not consider all of the factors set forth in 20 C.F.R. § 404.1527(c)(2)-(6), as he did not mention that Dr. Burch was Claimant's treating neurologist; however, the ALJ unquestionably realized that Dr. Burch treated Claimant for an extended period of time. The ALJ reviewed and discussed most of Dr. Burch's records. "[W]hile the ALJ also has a duty to 'consider' each of the ... factors listed above, that does not mean that the ALJ has a duty to discuss them when giving 'good reasons.' Stated differently, the regulations require the ALJ to consider the ... factors, but do not demand that the ALJ explicitly discuss each of the factors." *Hardy*

*v. Colvin,* No. 2:13–cv–20749, 2014 WL 4929464, at *2 (S.D.W.Va. Sept. 30, 2014). The ALJ is only required to give "good reasons" in the decision for the weight ultimately allocated to medical source opinions. *Id.* § 404.1527(c)(2). He fulfilled that duty in this case.

Lastly, the ALJ gave no weight to Dr. Burch's opinion that Claimant was "unable to sustain any kind of work." (Tr. at 22). The ALJ explained that Dr. Burch had no vocational expertise and, moreover, such an opinion was inconsistent with his own objective findings, as well as the findings made by Dr. Craft when he examined Claimant. Ultimately, Dr. Burch's opinions that Claimant was disabled and unable to work were opinions on an issue reserved to the Commissioner. Such opinions are never entitled to controlling weight or special significance. The ALJ properly considered the opinions and found that they were not supported by the objective evidence and were inconsistent with Claimant's physical findings. Accordingly, rather than ignore them, the ALJ assessed them for support and consistency with the record as a whole as required by the regulations and rulings, and found them lacking.

Therefore, the undersigned **FINDS** that the ALJ complied with applicable Social Security regulations and ruling in weighing the medical source opinions, and he supplied good reasons for not affording controlling weight to all of the opinions offered by Dr. Burch.

### C. Hypothetical Questions

Lastly, Claimant alleges that the ALJ's findings at the fifth step of the sequential process were erroneous because they were based upon hypothetical questions to the vocational expert that did not fairly represent the severity of Claimant's impairments. Specifically, Claimant maintains that the third hypothetical scenario proposed to the

vocational expert best represented Claimant's limitations, and the vocational expert testified that a hypothetical claimant with those stated limitations was not employable. However, instead of accepting that testimony, the ALJ chose to adopt testimony related to the second hypothetical question, which did not fully account for the episodic nature of Claimant's medical condition.

At step five of the sequential process, the Commissioner must demonstrate that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain*, 715 F.2d at 868-69. The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore*, 538 F.2d. at 574. In order to carry this burden, the Commissioner may rely upon the Medical-Vocational Guidelines listed in Appendix 2 of Subpart P of Part 404 (the "Grids"), "which take administrative notice of the availability of job types in the national economy for persons having certain characteristics, namely age, education, previous work experience, and residual functional capacity." *Grant v. Schweiker*, 699 F.2d 189, 191-92 (4th Cir. 1983); *see also* 20 C.F.R. §§ 404.1569, 416.969.

The Grids categorize jobs by their physical-exertion requirements; accordingly, "[a]t step 5 of the sequential evaluation process, RFC must be expressed in terms of, or related to, the exertional categories when the adjudicator determines whether there is other work the individual can do." SSR 96-8p, 1996 WL 374184, at *3 (emphasis added). However, the Grids consider only the exertional component of a claimant's disability,

and even then, they do not contemplate all possible variations of exertional levels. 20 C.F.R. §416.969. For that reason, when a claimant has significant nonexertional impairments, has a combination of exertional and nonexertional impairments, or has an RFC that falls between exertional levels, the Grids merely provide a framework to the ALJ, who must give full individualized consideration to the relevant facts of the claim in order to establish the existence of available jobs. *Id.* § 416.969; 20 C.F.R. Pt. 404, Subpart P, App'x 2 § 200.00(d); *see also Haynes v. Barnhart*, 416 F.3d 621, 629 (7th Cir. 2005) (recognizing that where RFC falls between sedentary and light work, Grids are used only as framework); *Hence v. Astrue*, No. 4:12cv1, 2012 WL 6691573, at *8 (E.D. Va. Nov. 30, 2012) (citing the Grids and SSR 83-12 in observing that where a claimant's RFC is between exertional levels, the Grids do not apply), report and recommendation adopted by 2012 WL 6697109 (E.D. Va. Dec. 21, 2012); *Frobes v. Barnhart*, 467 F. Supp. 2d 808, 821 (N.D. Ill. 2006) (stating that Grids only provide guidance where claimant falls between exertional levels).

Because the analysis subtly shifts at step five from an assessment of the claimant's limitations and capabilities to the identification of the claimant's potential occupational base, matching the appropriate exertional level to the claimant's RFC is the starting point. As the RFC is intended to reflect the **most** the claimant can do, rather than the least, the ALJ expresses the RFC in terms of the highest level of exertional work that the claimant is generally capable of performing, but which is "insufficient to allow substantial performance of work at greater exertional levels." SSR 83-10, 1983 WL 31251, at *2; *see also* SSR 96-8p, 1996 WL 374184, at *2 (recognizing RFC represents most that individual can do given limitations). From there, the ALJ must determine whether the claimant's RFC permits him to perform the full range of work contemplated

by the relevant exertional level. SSR 83-10, 1983 WL 31251, at *5. "[I]n order for an individual to do a full range of work at a given exertional level the individual must be able to perform substantially all of the exertional and nonexertional functions required in work at that level." SSR 96-8p, 1996 WL 374184, at *3. If the claimant's combined exertional and nonexertional impairments allow him to perform some of the occupations classified at a particular exertional level, but not all of them, the occupational base at that exertional level will be reduced to the extent that the claimant's restrictions and limitations prevent him from doing the full range of work contemplated by the exertional level. *See* SSR 83-14, 1983 WL 31254, at *6 ("Where it is clear that additional limitations or restrictions have significantly eroded the exertional job base set by the exertional limitations alone, the remaining portion of the job base will guide the decision."). In making this determination, "the ALJ generally must accept evidence from a vocational expert, who, based on the claimant's age, education, work experience, and RFC, testifies whether there are jobs for such a person in the national economy." *Morgan v. Barnhart*, 142 F. App'x 716, 720-21 (4th Cir. 2005).

In order for a vocational expert's opinion to be relevant, it must be in response to a proper hypothetical question that sets forth all of the claimant's impairments. *English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir. 1993); *Walker v. Bowen*, 889 F.2d 47, 50-51 (4th Cir. 1989). To frame a proper hypothetical question, the ALJ must first translate the claimant's physical and mental impairments into a RFC that is supported by the evidence; one which adequately reflects the limitations imposed by the claimant's impairments. *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006). "[I]t is the claimant's functional capacity, not his clinical impairments, that the ALJ must relate to the vocational expert." *Fisher v. Barnhart,* 181 F. App'x 359, 364 (4th Cir. 2006). A

hypothetical question will be "unimpeachable if it adequately reflects a residual functional capacity for which the ALJ had sufficient evidence." *Id.* (citing *Johnson v. Barnhart,* 434 F.3d 650, 659 (4th Cir. 2005)) (internal quotation marks omitted); *see also Russell v. Barnhart*, 58 F. App'x 25, 30 (4th Cir. 2003) (noting that hypothetical question "need only reflect those impairments supported by the record"). However, "[t]he Commissioner can show that the claimant is not disabled only if the vocational expert's testimony that jobs exist in the national economy is in response to questions from the ALJ that accurately reflect the claimant's work-related abilities." *Morgan*, 142 F.App'x at 720-21.

In the second hypothetical question, the ALJ asked the vocational expert to assume the limitations set forth in Claimant's RFC. (Tr. at 20, 52, 54). The ALJ asked the vocational expert to assume that the hypothetical claimant was Claimant's age and had Claimant's educational and work history; he could perform light exertional work except that he could occasionally lift twenty pounds and ten pounds frequently; he could stand/walk six hours and sit six hours in an eight-hour workday; he could frequently handle and finger objects but only occasionally push/pull or operate foot controls, climb ramps or stairs, balance, stoop, kneel, crouch, and crawl; he could never climb ladders, ropes, or scaffolds; he must avoid concentrated exposure to extreme heat, cold, vibrations, moving or hazardous machinery and unprotected heights; and because he would be off task 5% of the time, he was limited to simple, routine, unskilled tasks in a low-stress work setting, defined as having only occasional decision-making or changes in the work setting and with only occasional interaction with co-workers. (*Id.*) Assuming those factors, the vocational expert found jobs in significant numbers in the regional and national economy that the hypothetical claimant could perform. (Tr. at 54). The

third hypothetical altered Claimant's RFC by further reducing the hypothetical claimant's ability to handle and finger objects, by increasing the amount of time off-task to 20%, by adding three or more absences per month from the work place, and by including additional breaks during the work day. (Tr. at 55). Faced with this hypothetical claimant, the vocational expert testified that no jobs were available. Because Claimant contends that the third hypothetical more accurately reflects his RFC, and that RFC precludes employment, the undersigned examines the adequacy of the ALJ's RFC finding.

SSR 96-8p provides guidance on how to properly assess a claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1. RFC is a measurement of the ***most*** that a claimant can do despite his or her limitations and is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id.* According to the Ruling, the ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3. Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." *Id.* Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual

38

may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id.* at *4.

In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* at *7. With allegations of pain or mental distress, the RFC assessment must 1) "contain a thorough discussion and analysis of the objective medical and other evidence, including the individual's complaints of pain and other symptoms and the adjudicator's personal observations, if appropriate;" 2) "include a resolution of any inconsistencies in the evidence as a whole;" and 3) "set forth a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work." *Id.* Moreover, the ALJ must discuss "why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.* Similarly, the ALJ "must always consider and address medical source opinions" in assessing the claimant's RFC. *Id.* As with symptom allegations, "[i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." *Id.*

In this case, the ALJ performed a thorough analysis and discussion of the medical information and reviewed the other evidence in the record. (Tr. at 15-20). He weighed the medical source statements, and made a determination as to the credibility of Claimant's reports of disabling pain, pointing to specific parts of the record that he felt illustrated the bases of his conclusions. (Tr. at 20-22). The ALJ explained how he

considered and resolved inconsistencies in the evidence, and provided a logical rationale for the limitations he determined were consistent with the record as a whole. The RFC itself was quite detailed, accounting for Claimant's musculoskeletal limitations, as well as restrictions related to his difficulties with maintaining concentration and persistence and his problems with social interaction. (Tr. at 20). Therefore, the ALJ fully complied with the rulings and regulations in determining Claimant's RFC. Once the ALJ made an RFC finding that included exertional and nonexertional limitations, he properly elicited the assistance of a vocational expert to determine if jobs existed that Claimant could perform. The ALJ obviously performed a function-by-function assessment and supplied to the vocational expert in the second hypothetical question a comprehensive RFC that adequately reflected the functional impairments supported by the record. Thus, the vocational expert was asked a proper hypothetical question that fairly set forth all of the Claimant's impairments, and the ALJ was entitled to rely upon the testimony provided in response.

Accordingly, the undersigned **FINDS** that the RFC findings, the hypothetical questions, and the ALJ's determination at step five of the sequential process all complied with the relevant regulations and rulings.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the District Court confirm and accept the findings herein and **RECOMMENDS** that the District Court **DENY** Plaintiff's Motion for Judgment on the Pleadings, (ECF No. 11), **GRANT** Defendant's Motion for Judgment on the Pleadings, (ECF No. 12), **AFFIRM** the decision of the Commissioner, and **DISMISS** this action, with prejudice, from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable David A. Faber, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Faber and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** February 10, 2015

Cheryl A. Eifert
United States Magistrate Judge

41